DANIEL S. LIM (Cal. Bar No. 292406)
Email: limda@sec.gov
KELLY C. BOWERS (Cal. Bar No. 164007)
Email: bowersk@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Brent Wilner, Associate Director
Stephen Kam, Supervisory Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>DARREN J. CARIS and CARIS INVESTMENT PARTNERS, INC.,<br><br>Defendants. | Case No. '26CV5714 TWR JAC<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

**<u>JURISDICTION AND VENUE</u>**

1. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a), and Sections 209(d), 209(e)(1) and 214 of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-9(d), 80b-9(e)(1) & 90b-14.

2. Defendants Darren J. Caris ("Caris") and Caris Investment Partners, Inc. ("CIP") (collectively, "Defendants") have, directly or indirectly, made use of the

means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), and Section 214 of the Advisers Act, 15 U.S.C. §§ 80b-14, because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because Caris resides in this district, and CIP has its principal place of business in this district.

## SUMMARY

4. This case is about a "cherry-picking" scheme carried out by Caris and the investment adviser firm that he solely owned and controlled, CIP.

5. Between December 2023 and April 2024, Caris had discretionary trading authority over CIP client investment accounts, meaning he had the authority to make investment decisions and execute trades on their behalf. Caris placed many of these trades through what is commonly called a "block trading account," which allowed him to place stock trades and later allocate those trades among the various accounts over which he had discretionary trading authority. Caris submitted these allocations to a brokerage firm well after he placed the trades and observed share-price movement, giving him the opportunity to "cherry-pick"—that is, disproportionately allocate winning trades to his personal account (the "Caris Account"), and disproportionately allocate losing trades to 16 client accounts (the "Client Accounts").

6. Caris took advantage of this opportunity to commit fraud on his clients. By disproportionately allocating profitable trades to the Caris Account and unprofitable trades to the Client Accounts, Caris reaped substantial profits at his clients' expense, violated the fiduciary duties he owed to his clients, and violated the

federal securities laws.

7. As part of his scheme, Caris lulled his clients into thinking that the broker-dealer with custody over Caris/CIP's client accounts ("Broker A") was no longer going to work with CIP for reasons other than Broker A's explicitly stated reason, i.e., "concerns with [Caris's] trading."

8. Caris and CIP also made the following false and misleading representations to clients and prospective clients: CIP/Caris would not favor their own accounts over client accounts when allocating trades, CIP/Caris would prepare written statements prior to and specifying the allocations, and each account would participate at the average share price for a given security on a given day without any favoritism.

9. In total, Caris's cherry-picking scheme enabled him to obtain approximately $158,458 in first-day profits for his own account. At the same time, the client accounts suffered approximately $143,754 in first-day losses because of Caris's fraud.

10. Based on a statistical analysis, the likelihood that Caris's disproportionate allocation of profitable trades to the Caris Account and unprofitable trades to Client accounts resulted from random chance, as opposed to knowing and intentional conduct, is, at best, less than one in a million.

11. By engaging in this conduct, defendant Caris and CIP violated the antifraud provisions of Sections 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(1) and (2).

12. With this action, the SEC seeks a permanent injunction prohibiting future violations of the federal securities laws, a conduct-based injunction for Caris, and an order requiring Caris and CIP to disgorge their ill-gotten gains on a joint and several basis, along with prejudgment interest, and to pay civil penalties.

## THE DEFENDANTS

13. Defendant Caris Investment Partners, Inc. is a California corporation in Encinitas, California. CIP has been registered as an investment adviser with the State of California since September 2019, and with the State of Hawaii since May 2025. As of 2025, CIP had 64 clients and $54.6 million in regulatory assets under management.

14. Defendant Darren J. Caris, age 55, is a resident of Encinitas, California. Caris is the founder, sole owner, officer, and employee of CIP. Caris has been operating CIP since September 2019 and has generally worked in the securities industry since 1993, including approximately 18 years at various broker-dealers, of which ten years were as president of registered broker-dealer Caris & Company. Caris currently holds a Series 65 securities license and previously held Series 7, 24, 55, and 63 securities licenses.

## THE ALLEGATIONS

### A. Background

15. Caris founded CIP in 2019, and was the sole owner, chief executive officer, chief investment officer, chief compliance officer, and employee of CIP through April 2024.

16. At all relevant times, Caris and CIP were both investment advisers under Section 202(a)(11) of the Advisers Act, 15 U.S.C. §80b-2(a)(11). Specifically, CIP was a state-registered investment adviser that was in the business of providing clients investment advice regarding securities for fees. Similarly, Caris regularly provided clients investment advice about securities, and he, as CIP's sole owner, received compensation from the fees clients paid to CIP.

17. Caris had discretionary trading authority over his clients' accounts to buy and sell securities on their behalf, meaning clients granted him the authority to decide which securities to purchase and sell without having to consult them. He could also buy and sell securities for the Caris Account.

18. Caris could place trades directly or through the CIP block trading account.

19. Direct trades were sales or purchases of securities directly in either the Caris Account or Client Accounts.

20. Block trades were trades that Caris placed through CIP's block trading account at Broker A, the custodian of the Caris Account and Client Accounts.

21. Block trading allowed Caris to place trades through the block trading account at Broker A, and later that same day or shortly after, allocate that trade to the Caris Account and/or Client Accounts.

22. Caris was the only person at CIP who placed trades in the block account and then allocated them to the Caris Account or Client Accounts.

**B. The Cherry-Picking Scheme**

23. From December 2023 to April 2024, Caris misused the block trading account at Broker A to engage in a fraudulent scheme by cherry-picking and disproportionately allocating profitable trades to his own personal account. In doing so, Caris defrauded his clients and violated the fiduciary duties that he owed to them.

24. Caris carried out this scheme by executing trades in the block trading account and taking advantage of the time he had to allocate those trades in order to determine the security's intraday performance.

25. For example, when the price of a stock rose between the time of purchase and the time of allocation, Caris disproportionately allocated these profitable trades to the Caris Account. In most instances when Caris did this, he sold the security that same day and allocated that sale to the Caris Account, making it a day-trade with immediate realized profits.

26. By contrast, when the price of a stock went down between the time of purchase and the time of allocation, Caris disproportionally allocated those unprofitable trades to the Client Accounts.

27. This scheme, by its very nature, was inherently deceptive because

cherry-picking is virtually impossible for clients to detect on their own. Clients are generally unable to see how their investment adviser allocates trades and thus rely on their adviser to meet his fiduciary duty of care to provide investment advice that is in their best interest. Clients also expect and rely on their adviser to meet his fiduciary duty of loyalty by putting clients' financial interests ahead of his own.

28. Thus, Caris's allocations based on the securities' performance were inherently deceptive acts in furtherance of his scheme.

**1. Examples of Caris's Cherry-Picking**

29. Caris's cherry-picking allowed him to allocate securities trades when profitable to the Caris Account and allocate trades of the very same securities when unprofitable to the Client Accounts, oftentimes on the same day, at significant gain to him and significant loss to his clients. As one example:

a. On March 5, 2024, at approximately 3:35 p.m. ET, Caris used the block account to purchase 1,000 shares of Albemarle Corporation stock ("ALB") for approximately $112.09 per share.

b. At approximately 3:58 p.m. ET on the same day, Caris used the block account to purchase 1,000 additional shares of ALB for approximately $106.70 per share.

c. At approximately 3:59 p.m. ET, Caris allocated the initial 1,000 ALB shares purchased at the higher price per share ($112.09) to three of the Client Accounts. At the time of the allocation, ALB was trading at approximately $106.87 per share, and the three Client Accounts collectively suffered unrealized losses of over $5,200.

d. At approximately 4:00 p.m. ET, Caris used the block account to sell 1,000 ALB shares for approximately $109.85 per share. At approximately 4:03 p.m. ET, Caris allocated both the purchase (at $106.70 per share) and sale (at $109.85 per share) of these 1,000 shares to the Caris Account. As a result, the Caris Account made a realized profit of over $3,100.

30. As another example of preferential allocations involving the same securities:

a. On February 21, 2024, between 10:08 a.m. ET and 10:35 a.m. ET, Caris used the block account to purchase 8,000 shares of Rivian Automotive, Inc. ("RIVN") for approximately $15.60 per share.

b. At approximately 4:10 p.m. ET, Caris used the block account to sell these 8,000 shares after the price had risen to approximately $15.92 per share.

c. At approximately 4:11 p.m. ET, Caris allocated the entire 8,000 shares purchased and sold to the Caris Account. As a result, the Caris Account made a realized profit of over $2,500.

d. Relatedly, on March 14, 2024, between 9:02 a.m. ET and 10:06 a.m. ET, Caris used the block account to purchase 16,000 shares of RIVN stock for approximately $11.39 per share.

e. At approximately 3:03 p.m. ET, after the share price had declined to approximately $10.57 per share, Caris allocated all 16,000 shares to three of the Client Accounts. As a result, the three Client Accounts collectively suffered unrealized losses of over $13,000.

31. At the time of allocations of these trades, Caris knew the prior purchase price of the block purchase and/or the prior sale price of the block sale.

### 2. Broker A's Decision to Terminate its Relationship with CIP, and Caris's Subsequent Lulling of Clients

32. On or about April 4, 2024, a Broker A employee called Caris and notified him that he had noticed Caris's "preferential block trade allocation[s] . . . made after the outcome of the trade is known."

33. On this call, the Broker A employee asked Caris for evidence that Caris recorded his allocations before knowing whether the trade was profitable or not, and Caris responded that he did not have any such evidence.

34. Following this call, Caris continued to disproportionately cherry-pick

trades.

35. On or about April 29, 2024, Broker A notified Caris via letter that it had "elected to terminate [the relationship] with CIP, effective July 29, 2024," due to "concerns with trading." In the letter, Broker A specified that Caris would have to find a new custodian within 90 days.

36. On May 1, 2024—after he received the April 29, 2024 letter from Broker A—Caris sent an email to clients stating that: "After considerable thought, I have decided to move platforms to [another broker-dealer custodian]."

37. He continued in the May 1, 2024 email: "My reasons for doing so include a lack of adequate customer service [] for my clients, late processing [], money movement latency that has cost clients valuable time, and repeated trading errors." Caris also told his clients in this email that "[Broker A] and I have agreed on a 90-day transition."

38. However, Caris did not "decide" to move to a new broker-custodian; he was forced to move to a new broker-custodian due to Broker A's concerns about Caris/CIP's trading.

39. Further, none of the reasons given by Caris was the cause of Broker A no longer being CIP's broker-dealer custodian.

40. Additionally, Broker A alone dictated the 90-day transition period, without any agreement with or input from Caris.

41. Accordingly, Caris lulled his clients into thinking that this separation was business as usual and initiated by Caris, when it was actually forced upon him due to his improper trading and allocation practices.

**3. Caris Received Over $158,000 in First-Day Profits While His Clients Suffered Over $143,000 in First-Day Losses**

42. In total, from December 2023 to April 2024, Caris's allocations through the block trading account—over $44 million in dollars traded—resulted in approximately: (1) 95.8% of all trades allocated to the Caris Account (over $28

million in dollars traded) being profitable; and (2) 14.9% of all trades allocated to the Client Accounts (over $16 million in dollars traded) being profitable.

43. During the same period, Caris's allocations through the block trading account resulted in approximately: (1) a positive rate of return (.555%) on allocations to the Caris Account; and (2) a negative rate of return (-.887%) on allocations to the Client Accounts.

44. The scheme resulted in Caris receiving approximately $158,458 in first-day profits from December 2023 to April 2024.

45. The scheme also resulted in the Client Accounts suffering approximately $143,754 in first-day losses over the same period.

46. Caris also transferred money from his cherry-picking scheme to CIP during the same period.

**C. Caris and CIP's False and Misleading Statements**

**1. False and Misleading Statements in Brochures**

47. As an investment adviser registered with the State of California, CIP was required to file a Form ADV Part 2A with the Investment Adviser Registration Depository.

48. In this form, also known as a brochure, investment advisers are required to write in plain English the types of advisory services offered, the adviser's fee schedule, disciplinary information, conflicts of interest, and the educational and business background of management and key advisory personnel of the adviser. When filed, these forms are available to clients and the public online.

49. Caris prepared, approved, and filed and/or distributed CIP's May 3, 2023 and December 31, 2023 Forms ADV Part 2A (also known and hereinafter referred to as the "Brochures"), which were the operative Brochures during the same period that Caris was cherry-picking.

50. As the sole owner of CIP, Caris had ultimate authority over the statements contained in CIP's Brochures.

51. CIP's Brochures contained materially false and misleading statements concerning its allocation of trades and its management of conflicts of interest relating to Caris's own personal trading.

52. For example, the Brochures stated that: "We will not favor any account over any other account. This includes accounts of CIP or any of our personnel."

53. This statement was false and misleading because Caris in fact favored the Caris Account over the Client Accounts in allocating the block trades, as alleged above.

54. The Brochures also stated that: "Before entering an aggregated order, we will prepare a written statement [] specifying the participating accounts and how we intend to allocate the order among those accounts."

55. This statement was false and misleading because, as Caris himself admitted, he failed to prepare any written statements indicating how he intended to allocate the trades.

56. The Brochures further stated that: "Each account in the aggregated order will participate at the average share price for all of our aggregated transactions in a given security on a given business day (per custodian)."

57. This statement was false and misleading because Caris did not have each account in the aggregated order "participate at the average share price." Instead, contrary to this representation, and as described above in Paragraph 29, Caris would place multiple purchases of the same securities throughout the day, and allocate the higher-priced purchases to the Client Accounts, and allocate the lower-priced purchases to the Caris Account, to the detriment of the Client Accounts.

### 3. The False and Misleading Statements to Clients Were Material

58. A reasonable client would have considered it important in deciding to invest with Caris and CIP that Caris's statements in CIP's Brochures regarding not favoring certain accounts, having pre-allocation statements, and purported controls

related to average share price attribution were false.

59. A reasonable client would also have considered it important in deciding to invest with Caris and CIP that there was never any mutual agreement regarding the terms of the separation between Broker A and CIP.

**D. Caris and CIP Owed Fiduciary Duties to Their Clients**

60. Caris and CIP were fiduciaries for their clients and owed them a duty of loyalty. That duty of loyalty included an affirmative duty of utmost good faith, a duty to provide full and fair disclosure of all material facts, and a duty to employ reasonable care to avoid misleading their clients.

61. Caris and CIP also owed their advisory clients a separate duty of care, which included a duty to provide investment advice that was in the best interest of their clients, and a duty to seek the best execution of their clients' securities transactions.

62. Caris, and thus CIP, knew about their fiduciary duties, as the CIP Brochures specifically stated that: "As part of our fiduciary duty to clients, CIP endeavors at all times to put the interest of our clients first."

63. Despite knowing of these duties, Caris—whose mental state is imputed to CIP as the sole owner and operator of CIP—knowingly engaged in cherry-picking, which:

a. violated his duty of loyalty because he was not acting in good faith when favoring his own personal account over all others, failed to disclose that he was engaging in preferential allocations, and deliberately misled his clients into thinking Caris and CIP were acting in their clients' best interests; and

b. violated his duty of care because, rather than provide investment advice in his clients' best interests, he surreptitiously made preferential allocations pursuant to his own interests, and to the detriment of his clients.

64. Further, despite knowing of these duties, Caris—whose mental state is imputed to CIP as the sole owner and operator of CIP —knowingly made false

statements in his Brochures and directly to his clients regarding Broker A, which:

a. violated his duty of loyalty because he was not acting in good faith when he misled his clients, failed to disclose the truth about the misrepresentations in the Brochures or reasons for Broker A's termination of CIP, and did not take reasonable care when he deliberately misled them.

b. violated his duty of care because, rather than provide investment advice in his clients' best interests, he provided false information that served his interests, and to the detriment of his clients.

**E. Caris' Scienter and Negligence**

65. Caris was the only person at CIP who had authority to determine how to allocate trades, and all trades placed in CIP's block trading account were allocated by him.

66. Based on a statistical analysis, the likelihood that Caris's disproportionate allocation of profitable trades to the Caris Account and unprofitable trades to Client accounts resulted from random chance, as opposed to knowing and intentional conduct, is, at best, less than one in a million.

67. Caris did not write down, record, or otherwise log his intended allocations prior to placing the block trades.

68. In April 2024, Caris was contacted about his improper trading practices, yet he continued to engage in cherry-picking.

69. Then, Caris concealed from his clients that Broker A was terminating its relationship with CIP due to his suspicious trading activity, and instead misled his clients into believing that he was terminating CIP's relationship with Broker A on his own terms due to Broker A's purported performance issues.

70. Accordingly, Caris knew, or was reckless in not knowing, that disproportionately allocating profitable trades to himself and unprofitable trades to his clients was improper and violated the fiduciary duties that he owed to them.

71. Caris prepared, authorized, and controlled the content—including the

false statements therein—and distribution of CIP's Brochures.

72. Therefore, Caris knew, or was reckless in not knowing, that his statements in CIP's Brochures were false and misleading and violated the fiduciary duties he owed to his clients.

73. Additionally, Caris knew, or was reckless in not knowing, that the reasons he gave to his clients for CIP finding a different broker-dealer custodian and the terms of separation were false and misleading, as Broker A explicitly informed Caris that it was terminating its relationship with CIP due to concerns related to Caris's suspicious trading activity.

74. Caris also acted negligently, as he failed to act reasonably under the circumstances when acting as his clients' investment adviser, by engaging in cherry-picking, making statements in Brochures that were false and misleading, and making false and misleading claims to investors regarding Broker A.

75. Caris's mental state is imputed to CIP as its sole owner, officer, employee, and control person.

**FIRST CLAIM FOR RELIEF**

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)**

**(against All Defendants)**

76. The SEC realleges and incorporates by reference paragraphs 1 through 75 above.

77. As alleged above, Defendants Caris and CIP cherry-picked profitable trades for the Caris Account and unprofitable trades for the Client Accounts. This cherry-picking scheme was inherently deceptive. In addition, Caris, through CIP, took steps to conceal that Broker A was removing CIP from its platform due to Caris's suspicious trading practices.

78. By engaging in the conduct described above, Defendants Caris and CIP, and each of them, directly or indirectly, in connection with the purchase or sale of a

security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: knowingly or recklessly (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

79. By engaging in the conduct described above, Defendants Caris and CIP violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

## SECOND CLAIM FOR RELIEF

### Fraud in Connection with the Purchase or Sale of Securities

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)

### (against All Defendants)

80. The SEC realleges and incorporates by reference paragraphs 1 through 75 above.

81. As alleged above, Defendants Caris and CIP made untrue statements of material fact in CIP's Brochures concerning not favoring certain accounts, preparing pre-allocation statements, and having purported controls related to average share price attribution.

82. By engaging in the conduct described above, Defendants Caris and CIP, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly or recklessly made untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

83. By engaging in the conduct described above, defendants Caris and CIP violated, and unless restrained and enjoined will continue to violate, Section 10(b) of

the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. §§ 240.10b-5(b).

**THIRD CLAIM FOR RELIEF**

**Fraud in the Offer or Sale of Securities**

**Violations of Sections 17(a)(1) and (3) of the Securities Act**

**(against All Defendants)**

84. The SEC realleges and incorporates by reference paragraphs 1 through 75 above.

85. As alleged above, Defendants Caris and CIP cherry-picked profitable trades for the Caris Account and unprofitable trades for the Client Accounts. This cherry-picking scheme was inherently deceptive. In addition, Caris, through CIP, took steps to conceal that Broker A was removing CIP from its platform due to Caris's suspicious trading practices.

86. By engaging in the conduct described above, Defendants Caris and CIP, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) knowingly or recklessly employed devices, schemes, or artifices to defraud; and (b) knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

87. By engaging in the conduct described above, Defendants Caris and CIP violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) & 77q(a)(3).

**FOURTH CLAIM FOR RELIEF**

**Fraud in the Offer or Sale of Securities**

**Violations of Section 17(a)(2) of the Securities Act**

**(against All Defendants)**

88. The SEC realleges and incorporates by reference paragraphs 1 through

75 above.

89. As alleged above, Defendants Caris and CIP obtained money by means of untrue statements of material fact in CIP's Brochures concerning not favoring certain accounts, preparing pre-allocation statements, and having purported controls related to average share price attribution.

90. By engaging in the conduct described above, Defendants Caris and CIP, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, knowingly, recklessly, or negligently obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

91. By engaging in the conduct described above, Defendants Caris and CIP violated, and unless restrained and enjoined will continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

**FIFTH CLAIM FOR RELIEF**

**Fraud by an Investment Adviser**

**Violations of Sections 206(1) and 206(2) of the Advisers Act**

**(against All Defendants)**

92. The SEC realleges and incorporates by reference paragraphs 1 through 75 above.

93. As alleged above, Defendants Caris and CIP each had an adviser-client relationship with, and therefore owed a fiduciary duty to, each of CIP's clients. Defendant Caris and CIP breached their fiduciary duties to their clients by carrying out the cherry-picking scheme—which was inherently deceptive—and by making materially false and misleading statements. These false and misleading statements included those in CIP's Brochures, and also those statements to clients concerning CIP's move to a different broker-dealer custodian.

94. By engaging in the conduct described above, defendants Caris and CIP, directly or indirectly, by use of the mails or means and instrumentalities of interstate commerce: (a) knowingly or recklessly employed devices, schemes, or artifices to defraud clients or prospective clients; and (b) knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients.

95. By engaging in the conduct described above, defendants Caris and CIP violated, and unless restrained and enjoined, will continue to violate, Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

**I.**

Issue findings of fact and conclusions of law that Defendants Caris and CIP committed the alleged violations.

**II.**

Issue a judgment, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Caris and CIP, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2).

**III.**

Enter an order permanently restraining and enjoining Defendant Caris from, directly or indirectly, acting as or being associated with any broker, dealer, or investment adviser, pursuant to Sections 21(d)(1) and (5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and (5)] and Section 209(d) of the Advisers Act [15 U.S.C. §

80b9(d)]. For purposes of this paragraph: (i) a person is associated with a broker or dealer if such person is a partner, officer, director, or branch manager of such broker or dealer (or occupies a similar status or performs similar functions), directly or indirectly controls, is controlled by, or is under common control with such broker or dealer, or is an employee of such broker or dealer; and (ii) a person is associated with an investment adviser if such person is a partner, officer, or director of such investment adviser (or performs similar functions), directly or indirectly controls or is controlled by such investment adviser, or is an employee of such investment adviser.

**IV.**

Order Defendants Caris and CIP to disgorge all funds received from their illegal conduct, on a joint and several basis, together with prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(3), (d)(5) and (d)(7), 15 U.S.C. §§ 78u(d)(3), (d)(5) and (d)(7).

**V.**

Order Defendants Caris and CIP to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 209(e) of the Adviser Act, 15 U.S.C. § 80b-9(e).

**VI.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VII.**

Grant such other and further relief as this Court may determine to be just and necessary.

///

///

## JURY DEMAND

The SEC demands a trial by jury on all issues so triable.

Dated: October 6, 2026

*/s/ Daniel S. Lim*

DANIEL S. LIM
KELLY C. BOWERS
Attorneys for Plaintiff
Securities and Exchange Commission